## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff,* | Civil Action No: |
| **v.** | <u>**COMPLAINT**</u> |
| **ROSALIND FRANKLIN UNIVERSITY, ROSALIND FRANKLIN UNIVERSITY BOARD OF TRUSTEES, ALLENA BARBATO, in her individual and official capacity, DR. NANCY PARSLEY, in her individual and official capacity, and DR. HEATHER KIND-KEPPEL in her individual and official capacity,** | **Jury Trial Demanded** |
| *Defendants.* | |

John Doe, ("Plaintiff" or "Doe")[1], by his attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, and Elvis Gonzalez, Ltd., whose offices are located at 233 South Wacker Drive, Suite 6149, Chicago, Illinois 60606, as and for his Complaint, respectfully alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.      This case arises out of Defendants' biased and wrongful actions taken in connection with a Title IX investigation against Doe, a talented and promising physician's assistant student at the Rosalind Franklin University College of Health Professions, which resulted in an erroneous finding of responsibility and ultimately, Doe's wrongful expulsion from the University.

---

[1] Plaintiff herewith files a motion to proceed under pseudonym.

1

2.      Doe received a Bachelor's degree in global health and worked as a Community Health Facilitator with the Peace Corps in Peru, working to reduce childhood anemia rates.

3.      Doe was a model student, having been awarded the prestigious and selective National Health Service Corps ("NHSC") scholarship from the federal government. The scholarship included full tuition for Doe and a living stipend of $1,200 per month. As part of the scholarship, upon graduation Doe intended to work for two years in a low-income health resource shortage area. Accordingly, Doe had a guaranteed job after graduation and an opportunity to be of service in an underprivileged area.

4.      However, Doe's lifelong dream of becoming a physician's assistant has been destroyed as a result of being erroneously found responsible for sexual assault. Rosalind Franklin University ("RFU" or the "University") conducted an investigation bereft of fairness as a consequence of false allegations of sexual misconduct brought against Doe by fellow student Jane Roe ("Jane" or "Roe")[2]. In investigating and adjudicating the false allegations against Doe, RFU deprived him of basic fairness when it conducted a disciplinary process that was neither thorough nor impartial, exhibited a gender bias against Doe as the male accused, and deprived him of his right to a fair proceeding

5.      A non-exhaustive list of RFU's wrongful actions includes the following: (i) while Jane's advisor was permitted to cross-examine witnesses, the hearing panel removed Doe and his advisor from the proceeding during the witness testimony, depriving Doe of a full and fair opportunity to cross-examine Roe's witnesses; (ii) the investigator used the biased and conclusory heading "[Roe] filed a Title IX complaint *because she was sexually assaulted* by [Doe]" demonstrating a presumption that Doe was responsible before any hearing took place; (iii) the

---

[2] Jane Roe is a pseudonym.

investigator overlooked improbabilities in Roe's account of having allegedly been sexually assaulted, including that Doe was incapacitated, Roe brought Doe back to her apartment via Uber rather than having the Uber bring him home, Roe engaged in sexual activity in which she was on top of Doe, she never sought help from her roommates during the alleged assault, did not leave when Doe went to use the restroom, and did nothing to physically impede the alleged assault despite being a trained member of the US army; (iv) the hearing panel conducted a biased and procedurally flawed hearing, wherein they prevented Doe from hearing the testimony of Roe's witnesses, permitted the introduction of irrelevant character testimony in support of Roe, and objected to and curtailed Doe's advisor's cross-examination of Roe and her witnesses; and (v) the University summarily dismissed Doe's appeal without evaluating the merits thereof.

6.      Doe therefore brings this action for relief based on violations of Title IX of the Education Amendments of 1972 and state law.

## **THE PARTIES**

7.       Doe is a natural person and a citizen of the State of Ohio.

8.      At all times relevant to this Complaint, Defendant RFU was and is a private institution of higher education with an address of 3333 Green Bay Road, North Chicago, IL 60064.

9.      At all times relevant to this Complaint, RFU received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX"). The total amount of federal funding RFU received for the 2021/2022 school year was $107,314,307.00.[3]

---

[3] https://projects.propublica.org/nonprofits/display_audit/4851720221

10.     Defendant Allena Barbato ("Barbato") is a natural person and, upon information and belief, a resident of the State of Illinois. Barbato was the Director of Title IX Compliance and Equity Officer at RFU at all relevant times herein.

11.     Defendant Dr. Nancy Parsley ("Parsley") is a natural person and, upon information and belief, a resident of the State of Illinois. Parsley was the Provost of RFU and the Title IX Appeal Decision Maker at all relevant times herein.

12.     Defendant Dr. Heather Kind-Keppel (the "Investigator") is a natural person and, upon information and belief, a resident of the State of Illinois. The Investigator was also the Executive Director of Diversity and Inclusion and Deputy Title IX Officer at RFU at all relevant times herein.

## JURISDICTION AND VENUE

13.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331–1332, 1367 (2018) because: (i) the federal law claims arise under the Constitution and statutes of the United States, (ii) the parties are citizens of different states, and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over Defendant RFU on the grounds that it is conducting business and is principally located in North Chicago, Illinois.

15.     This Court has personal jurisdiction over Defendant Barbato on the ground that she was employed by RFU at all relevant times herein.

16.     This Court has personal jurisdiction over Defendant Parsley on the ground that she was employed by RFU at all relevant times herein.

17.     This Court has personal jurisdiction over the Investigator Kind-Keppel on the ground that she was employed by RFU at all relevant times herein.

18.     Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because the events or omissions which give rise to Doe's claims took place in North Chicago, Illinois which is located in the Northern District of Illinois.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Plaintiff's Background Information.

19.     Doe grew up in the Bay Area of California with his parents and two younger sisters. Doe earned a Bachelor's degree in global health in May 2019 from the University of California San Diego and worked as a Community Health Facilitator with the Peace Corps in Peru where he worked to reduce childhood anemia rates.

20.     Doe, whose dream was to become a physician's assistant and help his community, applied for and was accepted to RFU.

21.     Doe was awarded the prestigious and selective NHSC scholarship from the federal government, from which he received full tuition and a living stipend of $1,200 per month, with a guaranteed job after graduation to service an underprivileged area.

22.     Doe matriculated at RFU in the summer of 2021 and maintained a GPA of 3.5 in his coursework. He expected to graduate in Spring 2023.

### II.     Background: The Effect of the "April 2011 Dear Colleague Letter" of the Department of Education's Office for Civil Rights on University Sexual Misconduct Policies.

23.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of

Education, Dear Colleague (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

24.     While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

25.     In a related guidance document published on April 29, 2014, the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter "2014 Q&A"), OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

26.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

27.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in

violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX.

28. In June 2014, the DOE's Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *Sexual Assault on Campus: Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. (2014) (statement of Catherine E. Lhamon, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ.).

29. Over the past decade, universities across the country, including RFU, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

30. To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited March 24, 2022).

31.     On September 22, 2017, OCR rescinded its 2011 DCL and its 2014 Q&A and noted that the agency had been widely criticized for putting "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear Colleague* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

32.     As former Secretary of Education Betsy Devos noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

33.     The OCR issued an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (hereinafter "2017 Q&A"), while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules. The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

34.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which went into effect on August 14, 2020. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19,

2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, inter alia, that schools can be found to have discriminated on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that the parties are entitled to a live hearing with cross-examination; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; and that investigators and decisionmakers must receive non-biased training, and may not rely on sex stereotypes.

35. The DOE launched a "comprehensive review" of the current Title IX regulations on April 6, 2021, in response to President Joseph Biden's March 8, 2021 Executive Order, *Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*, see https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.

36. On June 23, 2022, the DOE released their proposed changes to the Title IX Regulations. U.S. Department of Education, *The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment* (June 23, 2022), https://www.ed.gov/news/press-releases/us-department-education-releases-proposed-changes-title-ix-regulations-invites-public-comment.

37. On information and belief, RFU implements its sexual misconduct policies in a manner intended to protect women, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any institutional harm resulting from bad media attention and/or a possible loss of federal funds pursuant to an OCR investigation.

38.     On information and belief, RFU's institutional self-interest in avoiding bad press and student outrage resulted in an inherent gender bias which directly affected Doe's case, leading to an erroneous finding, and an unwarranted expulsion.

**III.     The Illinois Board of Higher Education Act for the Prevention of Sexual Violence in Higher Education.**

39.     Effective August 21, 2015, the Illinois General Assembly amended Act 205 of the Board of Higher Education Act commonly known as Preventing Sexual Violence in Higher Education Act (referenced herein as the "Act"). *See* 110 ILCS 205/9.21.

40.     The Act applies to: "a public university, a public community college, or an independent, not-for-profit or for-profit higher education institution located in this State."

41.     The Act sets forth a standard of care with which universities, including RFU, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

42.     In the instant case, RFU and its agents and employees breached their duty of care to Doe as an enrolled student subject to disciplinary proceedings governed by the Act. As a result of this breach, Doe suffered damages including loss of education, and loss of future educational and career opportunities.

43.     Section 25 of the Act (110 ILCS 155/25), provides the procedures for complaint resolution and mandates that all Illinois "Higher education institutions" including RFU, "shall provide, at a minimum all of the following:"

(1) Complainants alleging student violation of the comprehensive policy shall have the opportunity to request that the complaint resolution procedure begin promptly and proceed in a timely manner.

(2) The higher education institution shall determine the individuals who will resolve complaints of alleged student violations of the comprehensive policy.

(3) All individuals whose duties include resolution of complaints of student violations of the comprehensive policy shall receive a minimum of 8 to 10 hours of annual training on issues related to sexual violence, domestic violence, dating violence, and stalking and how to conduct the higher education institution's complaint resolution procedures, in addition to the annual training required for employees as provided in subsection (c) of Section 30 of this Act.

(4) The higher education institution shall have a sufficient number of individuals trained to resolve complaints so that (i) a substitution can occur in the case of a conflict of interest or recusal and (ii) an individual or individuals with no prior involvement in the initial determination or finding hear any appeal brought by a party.

(5) The individual or individuals resolving a complaint shall use a preponderance of the evidence standard to determine whether the alleged violation of the comprehensive policy occurred.

(6) The complainant and respondent shall (i) receive notice of the individual or individuals with authority to make a finding or impose a sanction in their proceeding before the individual or individuals initiate contact with either party and (ii) have the opportunity to request a substitution if the participation of an individual with authority to make a finding or impose a sanction poses a conflict of interest.

(7) The higher education institution shall have a procedure to determine interim protective measures and accommodations available pending the resolution of the complaint.

(8) Any proceeding, meeting, or hearing held to resolve complaints of alleged student violations of the comprehensive policy shall protect the privacy of the participating parties and witnesses.

(9) The complainant, regardless of this person's level of involvement in the complaint resolution procedure, and the respondent shall have the opportunity to provide or present evidence and witnesses on their behalf during the complaint resolution procedure.

(10) The complainant and the respondent may not directly cross-examine one another, but may, at the discretion and direction of the individual or individuals resolving the complaint, suggest questions to be posed by the individual or individuals resolving the complaint and respond to the other party.

(11) Both parties may request and must be allowed to have an advisor of their choice accompany them to any meeting or proceeding related to an alleged violation of the comprehensive policy, provided that the involvement of the advisor does not result in undue delay of the meeting or proceeding. The advisor must comply with any rules in the higher education institution's complaint resolution procedure regarding the advisor's role. If the advisor violates the rules or engages in behavior or advocacy that harasses, abuses, or intimidates either party, a witness, or an individual resolving the complaint, that advisor may be prohibited from further participation.

(12) The complainant and the respondent may not be compelled to testify, if the complaint resolution procedure involves a hearing, in the presence of the other party. If a party invokes this right, the higher education institution shall provide a procedure by which each party can, at a minimum, hear the other party's testimony.

(13) The complainant and the respondent are entitled to simultaneous, written notification of the results of the complaint resolution procedure, including information regarding appeal rights, within 7 days of a decision or sooner if required by State or federal law.

(14) The complainant and the respondent shall, at a minimum, have the right to timely appeal the complaint resolution procedure's findings or imposed sanctions if the party alleges (i) a procedural error occurred, (ii) new information exists that would substantially change the outcome of the finding, or (iii) the sanction is disproportionate with the violation. The individual or individuals reviewing the findings or imposed sanctions shall not have participated previously in the complaint resolution procedure and shall not have a conflict of interest with either party. The complainant and the respondent shall receive the appeal decision in writing within 7 days after the conclusion of the review of findings or sanctions or sooner if required by federal or State law.

(15) The higher education institution shall not disclose the identity of the survivor or the respondent, except as necessary to resolve the complaint or to implement interim protective measures and accommodations or when provided by State or federal law.

44.     Defendants violated these rights, as guaranteed by the Act, by: (i) the commission of procedural irregularities and a demonstration of bias against Doe in both the investigation and hearing related to Roe's complaints against Doe; and (ii) by failing to meaningfully afford Doe the presumption of innocence.

## IV.     RFU's Title IX Policy.

45.     Upon Doe's acceptance to RFU, the University provided him with *inter alia*, the RFU Student Handbook (the "Handbook"). The Handbook includes the University's Equal Opportunity Policy and the Title IX Policy: Discrimination Based On Sex (the "Policy").

46.     It is well accepted in Illinois that "a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v Aurora Univ.*, 346 Ill App 3d 728, 732, 805 NE2d 696, 699 (Ill. App. Ct. 2004).

47.     Accordingly, the Handbook is comprised of express and implied promises made by RFU to its students, including Doe, concerning how it will conduct the investigation and adjudication of sexual misconduct complaints.

48.     Contrary to the Handbook's assurance that "[t]he University does not engage in or tolerate discrimination on the basis of sex. . ." RFU evidenced bias against Doe as the male accused and violated several of its express and implied obligations during the investigation and adjudication of the complaint against Doe.

49.     The Handbook defines consent as:

> "(i) consent is a freely given agreement to sexual activity, (ii) a person's lack of verbal or physical resistance or submission resulting from the use or threat of force or any form of coercion does not constitute consent, (iii) a person's manner of dress does not constitute consent, (iv) a person's consent to past sexual activity does not constitute consent to future sexual activity, (v) a person's consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another, (vi) a person can withdraw consent at any time, and (vii) a person cannot consent to sexual activity if that person is unable to understand the nature of the activity or give knowing consent due to circumstances, including without limitation the following: (A) the person is incapacitated due to the use of influence of alcohol or drugs; (B) the person is asleep or unconscious; (C) the person is under age; or (D) the person is incapacitated due to a mental disability. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity or gender expression."

50.     The Handbook defines Sexual Assault as: "Any sexual act including rape, sodomy, sexual assault with an object, or fondling directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent."

51.     The Handbook defines Sexual Violence as: "Physical sexual acts attempted or perpetrated against a person's will or when a person is incapable of giving consent, including without limitation rape, sexual assault, sexual battery, sexual abuse, and sexual coercion, dating violence, domestic violence, and stalking."

52.     The Handbook notes that the University shall apply the Title IX Regulatory Policy to a "formal complaint" defined as "1. a document filed by a complainant with the Title IX Coordinator or signed by the Title IX Coordinator; 2. alleging sexual harassment (as defined in this section); 3. that occurred in an education program or activity of the University against the complainant while physically present in the United States; 4. that was perpetrated by a respondent; and 5. expressly requesting that the University investigate the allegation of sexual harassment."

53.     Concerning the third criteria "that occurred in an education program or activity of the University against the complainant while physically present in the United States;" the Handbook states:

> "The University's education programs or activities are locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by the University."

54.     Concerning the fourth criteria "that was perpetrated by a respondent" the Handbook states:

> "Respondent", for purposes of this section, means a University employee or University student who has been reported to be the perpetrator of conduct that could constitute sexual harassment. In the event the status of University employee or University student changes such that the person is no longer employed by or enrolled at the University, then the case shall no longer be subject to the Title IX Regulatory Investigation Policy or Title IX Regulatory Hearing Policy.

55.     Regarding student-to-student allegations of discrimination, Section XII paragraph B provides:

> "Any hearings shall be subject to the following requirements: 1. the preponderance of the evidence standard shall be used; 2. the parties shall be able to challenge decision-maker(s) for conflict of interest; 3. each party shall have opportunity to present evidence; 4. neither party may directly cross-examine the other party; 5. the parties may have advisors present to assist the party so long as the advisor complies with University policies and does not harass, abuse, or intimidate either party, a witness, or an individual resolving the complaint; 6. the parties may attend the

hearing and provide testimony in separate physical locations; 7. notifications to parties are prompt, equal in content, and simultaneous."

**V.      Events of November 20-21, 2021.**

56.     On November 20, 2021, Doe went to Complainant Roe's off-campus apartment with a group of friends, where he engaged in a drinking game.

57.     Doe consumed three rum and Cokes at Roe's apartment in the span of approximately one hour.

58.     Doe prepared the drinks himself and recalls putting one to two shots of rum in each drink he consumed.

59.     The group of friends, including Doe and Roe, left Roe's apartment with a designated driver, S.S., who drove them to a bar in Roe's car.

60.     While at the bar, Doe bought and consumed a rum and Coke. Roe also bought Doe an additional rum and Coke, which he drank.

61.     Several witnesses observed Doe while at the bar and described him as being very intoxicated.

62.     For instance, witness S.S., who was sober that evening, observed that Doe seemed a lot more intoxicated than Roe while they were at the bar.

63.     In fact, Witness R.G. said that she had never seen Doe as drunk as she had seen him at the bar on the evening of November 20, 2021.

64.     While R.G. failed to tell the Investigator that she had given Doe a marijuana edible at the bar, R.G. admitted at the Title IX hearing that she provided Doe with an edible marijuana (3.5 milligrams) at the bar, which he also ingested.

65.     Notably, when asked at the hearing why she failed to report this fact to the Investigator, R.G. stated that she didn't think it was relevant.

15

66.     This was in fact significant as Doe did not typically mix alcohol and marijuana, nor did he normally consume marijuana edibles.

67.     Approximately 30-45 minutes after Doe ingested the edible, Doe blacked out and has no further memory of the evening of November 20, 2021, with his next memory being the point at which he awoke on Roe's couch fully dressed the next morning at about 7:00 a.m.

68.     While Doe has no recollection of the events of November 20, 2021 for the several hours after he consumed the edible, according to Roe, their designated driver offered to drive her and Doe home from the bar, but Roe insisted that she and Doe would take an Uber back to her apartment instead.

69.     According to Roe, she did not ask Doe what his address was in order to have the Uber drive him home[4], did not ask Doe to order his own Uber home, and did not contact Doe's roommates or his girlfriend to pick up Doe or find out his address[5].

70.     Instead, Roe brought Doe back to her apartment in the Uber, undoubtedly aware of his state of intoxication.

71.     According to Roe, when they arrived at her home, she asked Doe to sleep on the couch downstairs because he had a girlfriend, to which Doe responded that was fine.

72.     However, Roe also alleged that upon arriving back to her room, Doe insisted on going to Roe's bedroom, where he allegedly initiated sexual activity.

73.     By Roe's own account, she consented to each sexual activity with Doe, when they engaged in the "69 position[6]" with Roe on top of Doe. Roe described that the 69 position requires

---

[4] Roe had been to Doe's apartment once before.
[5] Despite having access to their contact information.
[6] In the 69 position the participants each perform oral sex upon each other simultaneously.

mutual participation, Doe did not force her into that position, and that Roe got on top of Doe to perform oral sex on him, all of which occurred while he was severely intoxicated.

74.     Roe stated that after the initial sexual activity, Doe left her bedroom to go to the bathroom. Roe did not lock her bedroom door while Doe was in the bathroom, nor did she inform either of her roommates that she needed help while Doe was using the bathroom, confirming her clear consent to the sexual interaction.

75.     Further demonstrating that Roe consented to all sexual activity, she reported that she never raised her voice before or during the alleged sexual encounter with Doe, Roe's roommate had not heard Doe or Roe in Roe's room and had been unaware that Doe had spent the night at their apartment until she heard Roe discuss it the next day, Roe stated that when she woke up in the morning, she texted Doe to ask if he got home safely, and she did not claim to suffer any injuries of a result of the purported assault.

76.     According to Roe, when their sexual activity concluded, she told Doe that he had to go sleep downstairs, which he did.

VI.     **Roe Contacts Doe on November 26, 2021.**

77.     Roe texted Doe on November 26, 2021, asking if they could meet in person to talk.

78.     They arranged to meet at the library on November 27, 2021, at which point Roe proceeded to discuss their sexual encounter.

79.     Roe told Doe that they had sex and that he had not verbally asked her if she wanted to continue or not.

80.     Doe was completely shocked by Roe's allegations of sexual assault and advised that he had no memory of the alleged incident due to his state of intoxication.

81.     Roe's allegations ultimately caused Doe to experience a mental breakdown, which led him to finish the remainder of the semester online.

**VII.     Roe Reports the Incident to RFU.**

82.     On March 15, 2022, Roe filed a formal complaint with RFU against Doe, alleging that their encounter on November 20, 2021 was not consensual.[7]

83.     On March 21, 2022 Doe received an email from Vice President for Diversity, Equity, and Inclusion, Eric Williams, notifying him that Roe had filed a Title IX complaint against him ("the First Notice of Allegations"). The notice failed to include any details regarding the conduct at issue or the specific policies allegedly violated, stating only that RFU received information "about alleged inappropriate sexual contact" between Doe and Roe on November 20, 2021.

84.     The notice also attached a mutual No Contact and No Retaliation Order, prohibiting direct or indirect contact with Roe.

85.     Recognizing that the First Notice of Allegations was patently insufficient and in violation of Title IX, 34 C.F.R. § 106.45, due to its failure to provide even the most basic information regarding the allegations against Doe including the time of the alleged sexual misconduct or the particular acts of misconduct, Doe emailed RFU noting that the First Notice of Allegations was improper.

86.     On April 6, 2022, Barbato sent Doe a Second Notice of Allegations, describing the alleged incident as follows: "On November 20, 2021 at approximately 1am, [Doe], at the home of

---

[7] Roe incorrectly testified at the Title IX Hearing that she filed a complaint on December 21, 2021, the date listed in the original investigative report given to the parties (described below), which contained the names of parties other than her and Doe. The corrected report confirms the date of the complaint as March 15, 2022.

[Roe], engaged in unwanted verbal and physical conduct and touching, aggressive pushing, holding down, moving around, and unconsensual sex with her more than once."

87.    Barbato indicated that such behavior "could constitute sexual assault, sexual violence, and/or sexual harassment" under the University's Title IX Policy.

88.    Roe was interviewed on March 31, 2022, prior to issuance of the corrected Notice of Allegations to Doe, while Doe was not interviewed until May 5, 2022.

89.    Merely one week later, on May 12, 2022, RFU issued the Investigative Report, which summarized the testimony of the parties, as well as six witnesses, in less than six pages.

90.    The Investigative Report originally contained the names of parties other than Roe and Doe, indicating it had been copied and pasted from another Title IX investigation report involving different students, and incorrectly listed the date of the Complaint as December 21, 2021, instead of March 15, 2022, demonstrating the carelessness of RFU and Investigator Kind-Keppel.

91.    On May 16, 2022, Doe initiated the process to withdraw from RFU. He obtained approval for his withdrawal from his program director who advised that Doe's withdrawal was being sent to the Dean of the public health college for further approval.

92.    On May 18, 2022, Defendant Barbato emailed Doe stating: "I noticed that you have withdrawn from the University. Do you still plan on participating in the Title IX Hearing?"

93.    On May 19, 2022, Doe received an email from the Registrar's office stating that his change in student status had been approved.

94.    On May 20, 2022, Doe had an exit interview with RFU's director of financial aid.

95.    Also on May 20, 2022, Doe responded to Defendant Barbato, stating that he did not plan on participating in the Title IX Hearing, noting: "Pursuant to the University's Policy once I, as the Respondent, am no longer enrolled at the University, the application of the policy is

discontinued. Please confirm for me the University's position on this written policy and the dismissal of this matter."

96.     Throughout the following week, Doe emailed RFU's registrar's office to confirm that his withdrawal was complete, but he did not receive any response.

97.     On May 24, 2022, Doe emailed Barbato stating that he was following up on his previous email requesting confirmation that the University would honor its policy and discontinue and/or dismiss the Title IX matter as he was no longer enrolled at RFU.

98.     Shockingly, on May 31, 2022, Barbato emailed Doe stating that: "It seems your withdrawal status has not been approved and a hold has been placed on your account and registration, making you a current student at RFU. As you are still a student at RFU, the Title IX hearing will proceed."

99.     On information and belief RFU's Title IX Office prevented Plaintiff from withdrawing from RFU in order to be able to conduct the hearing and find Plaintiff responsible as the male accused.

100.     Doe did not receive any further communications from the Registrar's office.

101.     RFU's evident agenda to keep Doe under its "jurisdiction" and condemn him was made clear by the arbitrary reversal of his previously approved withdrawal, which came not from the Registrar or the Dean's Office but from Defendant Barbato.

102.     On June 3, 2022, RFU sent Doe a Notice of Hearing and Final Investigative Report and Right to File Response.

103.     On June 7, 2022, RFU issued a Corrected Final Investigative Report, which *inter alia* corrected the names of the parties to include Doe and Roe and the Complaint date.

104.     On June 14, 2022, a virtual hearing was held, during which RFU committed a

number of procedural violations and exhibited clear demonstrations of bias against Doe as the male accused. *See* discussion at Sections IX and X below.

105. Following the hearing, the RFU Decision Makers issued a letter, advising Doe that he was found responsible for violating RFU's Title IX policy, and that he was being sanctioned with an expulsion.

106. Doe and his advisor requested transcripts of the hearing and the recorded pre-hearing meeting, wherein he was reprimanded by Defendant Barbato in the presence of the hearing panel, for purposes of his appeal so that he could establish the bias resulting from Barbato's conduct. However, RFU denied Doe a copy of the pre-hearing meeting transcript.

107. On June 20, 2022, Doe submitted an appeal of RFU's determination and sanction.

108. On July 8, 2022, RFU issued its appeal decision denying Doe's appeal, thus constituting the final decision in this matter.

**VIII.**      **RFU Conducts a Flawed and Biased Investigation and Hearing Process.**

    *A. RFU Lacked Jurisdiction Over the Alleged Incident.*

109. Pursuant to the Title IX Final Rule summary "schools must respond when sexual harassment occurs in the school's education program or activity." "Education program or activity includes locations, events, or circumstances over which the school exercised substantial control over both the respondent and the context in which the sexual harassment occurred, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution (such as a fraternity or sorority house)." *See* Title IX Final Rule Summary Section 3.

110. Similarly, RFU's Title IX Policy as set forth in its Student Handbook provides that the University shall implement the Title IX Regulatory Policy to a "formal complaint" defined as

"1. a document filed by a complainant with the Title IX Coordinator or signed by the Title IX Coordinator; 2. alleging sexual harassment (as defined in this section); 3. **that occurred in an education program or activity of the University** against the complainant while physically present in the United States; that was perpetrated by a respondent; and expressly requesting that the University investigate the allegation of sexual harassment." (emphasis added)

111. The definition of: "that occurred in an education program or activity of the University against the complainant while physically present in the United States;" is: "The University's education programs or activities are **locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by the University**."

112. The complaint made by Roe described conduct that allegedly occurred in an off-campus apartment, in a building that was neither owned nor controlled by RFU, the alleged sexual harassment did not occur in the context of a university education program or activity, and Roe did not sufficiently establish any adverse impact to her educational experience as a result of the alleged harassment.

113. Thus, RFU implemented its Title IX policy and process in this matter without regard to the jurisdictional requirements implemented by the federal government in its amendments to Title IX in August of 2020.

114. In RFU's Appeal Decision, RFU improperly rejected Doe's argument that the University lacked jurisdiction, claiming that at the hearing Roe presented "ample" and "substantial" evidence that Doe's behavior "negatively affected her ability to focus and concentrate on her education and that her grades were negatively impacted."

115.    RFU plainly had an agenda to assert its jurisdiction over Doe, in order to find him responsible for a violation of the University's policies.

B.   *The Investigation Was Patently Flawed and Doe Was Deprived of an Opportunity to Meaningfully Critique it.*

116.    RFU further deprived Doe of a fair and impartial investigation process when Barbato denied Doe's request to question the Investigator as a witness during the hearing.

117.    Specifically, Doe and his advisor attended a pre-hearing conference on June 13, 2022, along with the hearing panel members and the Title IX Coordinator.

118.    During the pre-hearing conference, Doe and his attorney requested that Defendant Kind-Keppel be present at the hearing and available for questioning by Doe's advisor, as part of his right to present a meaningful defense.

119.    However, Defendant Barbato denied Doe's request, accused his attorney of "shredding" the investigation report, stated that any concerns with the investigation process should have been raised during the investigation, and accused them of trying to circumvent the process.

120.    Barbato's reprimand of Doe was inappropriately made in front of the members of the hearing panel, who were in attendance at this pre-hearing conference.

121.    Moreover, in accusing Doe of failing to raise any concerns with how the investigation process was being conducted earlier on, Barbato improperly ascribed to Doe the burden of ensuring the University conducted a fair investigation, notwithstanding that the policies provide that the burden rests with the Investigator.[8]

122.    Additionally, Barbato commented unfavorably on Doe's decision to refrain from answering any substantive questions during his interview due to his lack of memory of the relevant

---

[8] The burden of gathering evidence and the burden of proof must remain on universities, not on the parties. *See* Title IX Final Rule Summary Sec. 8

events, further painting him in a negative light in the eyes of the hearing panel members and thus, depriving Doe of a neutral and impartial panel before the hearing even began.

123.    Importantly, Doe had the right to decide upon his level of participation in the investigation process; per the applicable policies, this decision did not impact the Investigator's duty to conduct a fair, impartial and complete investigation, nor did it impact the hearing panel's duty to conduct a fair adjudication process.

   C.   *The Investigator Demonstrated a Bias Against Doe When She Overlooked Evidence Tending to Dispute Complainant's Account, in an Effort to Ensure a Responsibility Finding Against Plaintiff.*

124.    The biased nature of the investigation is patently evident from the face of the final report, demonstrating a clear bias on the part of the Investigator.

125.    For instance, the Investigator wrote, under the report's Detail and Consistency heading: "[Roe] filed a Title IX complaint because she was sexually assaulted by [Doe]," rather than "because she was allegedly sexually assaulted." This conclusive statement conveyed the Investigator's opinion that Doe was in fact responsible for committing an assault, even though the Investigator's responsibility was limited to fact gathering.

126.    Allowing the Investigator to inject her own opinions into the investigation report, which was then considered by the hearing panel, deprived Doe of the requisite presumption of innocence and further assured a responsibility finding against him.

127.    This statement was also a direct violation of Title IX which requires: "a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process."

128.     The Investigator further exhibited bias against Doe when she overlooked any evidence tending to dispute [Roe's] credibility and took steps to ensure a responsibility finding against Doe. By way of example and not limitation:

    a. RFU's investigation produced no proof of injuries, no forensic evidence, no contemporaneous reports or outcries, no physical evidence, and no medical records to corroborate Roe's claims.
    b. The Investigator failed to document a detailed description of Roe's allegations, instead choosing to include a mere 11 bullet points summarizing Roe's interview which deprived Doe of the opportunity to review the full report made against him.
    c. The Investigator did not ask Roe probing questions to discern the credibility or logic of her account.
    d. The Investigator did not ask Roe why she chose to stay with Doe at the bar when her group of friends told her they were leaving about an hour earlier using Roe's car.
    e. The Investigator did not ask Roe why she decided to take Doe to her home in an Uber or why she did not take him to his own home.
    f. The Investigator did not ask or investigate whether Roe suffered any injuries that may have corroborated her allegations of force.
    g. The Investigator drafted a report without asking any probing or objective questions about gaps in Roe's narrative, inconsistencies, or her behavior that defied common sense.

129.     Based on the foregoing, the Investigator failed to produce an impartial and comprehensive report, thus contributing to the erroneous findings against Doe.

## IX.     The Title IX Hearing Was Conducted in a Biased Manner Designed to Condemn Doe.

130.     Defendants further exhibited a bias against Doe when they conducted a hearing intended to reach the predetermined result that Doe was responsible for the alleged misconduct, despite the lack of evidence supporting this conclusion.

131.     Title IX rules: "require objective evaluation of all relevant evidence, inculpatory and exculpatory, and avoid credibility determinations based on a person's status as a complainant, respondent or witness." *See* Title IX Final Rule Summary Section 7.

132.    The hearing panel plainly violated this objectivity requirement during the Title IX hearing when they permitted irrelevant character evidence favoring Roe.

133.    By way of example, Roe's advisor asked Witness R.G. to describe what Roe was like "as a friend."  In response, the witness then began praising Roe's friendship attributes.

134.    When Doe's advisor objected to the testimony on the grounds that such character evidence was not admissible, one of the hearing panel members stated that it was not his time to speak.

135.    Additionally, the hearing panel addressed Roe in a gentle, coddling tone and responded supportively to everything she said.

136.    By contrast, the hearing panel addressed Doe in a stern and incredulous manner.

137.    Finally, while Doe was subjected to thorough questioning, hearing panel member Ms. Woyak asked Roe a total of one question at the hearing: "Did you give consent?"

## X.    Doe Was Deprived of His Right to Cross-Examine Roe and Her Witnesses.

138.    Doe was further deprived of his right to a fair and impartial process when hearing panel member Ms. Woyak interrupted Doe's advisor during his cross-examination and expressed support for Roe.

139.    At the hearing, Doe's advisor logically and appropriately questioned Roe about whether she, as a trained member of the US Army, tried to physically restrain Doe or protect herself from him.

140.    Again Ms. Woyak, this time joined by hearing panel member Ms. Sarah Garber, said that these questions were irrelevant and asked Doe's advisor to "move on."

141.    While Title IX rules expressly provide that, "At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and only other witnesses all

relevant questions and follow-up questions, including those challenging credibility" (*see* Title IX Final Rule Summary 9.(a)), both Ms. Woyak and Ms. Garber interrupted and abbreviated the cross-examination of Roe to Doe's detriment, when his advisor sought to question Roe about her claims that Doe performed oral sex on her against her will.

142. Roe's testimony at the hearing was inconsistent with the testimony provided in her interview with the Investigator, which was directly relevant to Roe's credibility.

143. Yet, Ms. Woyak and Ms. Garber asked Doe's advisor how the questions were relevant and directed him to "move on", depriving Doe of his right to meaningful cross-examine his accuser.

144. Furthermore, when Doe's advisor attempted to cross-examine Roe about the details regarding the alleged sexual activity between Doe and Roe, Ms. Woyak demonstrated prejudice against Doe by answering on behalf of Roe, stating "she's already stated this in her opening statements." Ms. Garber chimed in, noting: "that's exactly right."

145. Similarly, while the hearing panel members instructed Doe's advisor to be "a little more direct and efficient [in] your questioning, so that we can get through this" and "…be concise and focused on, we have a lot to get through," at no point did they interrupt Roe's advisor during her questioning of Doe, nor was she urged to prioritize efficiency.

146. These statements by the hearing panel members clearly demonstrate inappropriate bias against Doe, as their actions impeded his advisor's ability to question Roe and challenge her credibility.

147. Doe's opportunity to cross-examine his accuser was further impeded when, in the middle of his advisor's cross-examination of Roe, the hearing panel admitted a witness into the Zoom hearing.

148.     The hearing panel explained that the witnesses were scheduled for particular times and that the examination of Roe would have to be interrupted for the sake of "efficiency."

149.     Doe's advisor objected and requested that he be allowed to continue his questioning of Roe. However, the hearing panel proceeded with all of the witness testimony, postponing the remainder of Roe's cross-examination.

150.     Incredibly, the witnesses were required to testify outside the presence of the parties, when the hearing panel removed both parties from the hearing during the entirety of the witness presentations.

151.     Doe was placed in a Zoom waiting room for at least an hour while the witnesses were questioned. As such, Doe was not permitted to see or listen to the witnesses offered by Roe to testify against him, depriving him of the opportunity to challenge their testimony and present a meaningful defense, precluding his ability to offer suggested follow up questions for his advisor to ask the witnesses, and denying him the chance to refute or comment upon any of the witness testimony during his examination or in his closing statement.

152.     Accordingly, Doe's rights to cross-examine under the Act and RFU's Policy were violated as well.

## XI.     RFU Erroneously Finds Doe Responsible and Imposes a Sanction Upon Him.

153.     On June 14, 2022, RFU provided Doe with a Determination Regarding Responsibility Pursuant to the University's Policy Prohibiting Sex-Based Misconduct, finding him responsible for violating RFU's Title IX Policy.

154.     The determination was flawed for several reasons, as described below.

155.     First, the findings of the Determination faulted Doe for stating that he did not recall obtaining consent to engage in sexual relations with Roe, however the determination omitted the

reason that Doe could not recall obtaining consent: that Doe was severely intoxicated to such a degree that he could not recall anything that occurred after he left the bar in the early hours of November 21, 2021.

156.    Importantly, under RFU's definition of consent, Doe would not have been able to consent to sexual activity with Roe due to his incapacitation as he had ingested both drugs and alcohol. Yet, this was not considered by the hearing panel in reaching their conclusion that Doe was the individual who failed to obtain consent, rather than Roe.

157.    Second, the determination failed to note that Roe texted Doe after he left her apartment to make sure he got home safely, disproving her claim that she had just been sexually assaulted.

158.    Third, the findings stated: "[t]ext messages, which occurred after the complainant confronted the respondent with a written [sic] of her experiences in the early morning of November 21, 2021, support this finding."

159.    However, Doe explained that when Roe presented her allegations to him, he panicked and went into a fight or flight response. He explained that he felt badly because he did not remember anything and did not initially feel comfortable questioning Roe's statements as he was shocked by her allegations and subsequently had a mental breakdown.

160.    Fourth, the determination credited "consistent reports of aggressive sexualized behavior by Doe while at a bar in Highwood IL on November 20, 2021," which referred to testimony provided by Witness R.G. outside the presence of the parties during the hearing.

161.    Apparently, R.G. claimed that Doe danced aggressively with her, which is plainly not corroborative of Roe's allegations of rape. Yet, this claim – which Doe was not able to question given he was excluded from the hearing during this testimony – was evidently relied upon by the

hearing panel to find a pattern of behavior supporting the female complainant's claims, where no such pattern existed.

162.    Moreover, R.G. admitted to providing Doe with a marijuana edible despite noting that he was visibly quite intoxicated at that point. This witness further admitted to failing to report to the Investigator that she provided Doe with the marijuana edible.

163.    Doe's inability to discuss R.G.'s testimony with his advisor in real time, to suggest questions regarding the credibility of the witness, and to describe conversations he had with her when she provided him with a marijuana edible negatively affected his ability to challenge her credibility and was contrary to his rights under the Act and RFU's Policy.

164.    As a result of the erroneous findings, the hearing panel determined that Doe should be expelled from all RFU's programs and activities (the "Sanction").

165.    Doe also lost his NHSC scholarship as a result of the Sanction.

## XII.        RFU Wrongfully Denied Doe's Appeal.

166.    Doe promptly appealed the Determination against him on June 20, 2022, on the grounds that (i) RFU committed procedural errors throughout the proceedings that adversely affected the outcome; and (ii) that RFU exhibited a bias against him that adversely affected the outcome.

167.    On July 8, 2022, Dr. Parsley issued an appeal decision to Doe summarily dismissing and denying every point he made in his appeal.

168.    Dr. Parsley incorrectly determined that RFU had jurisdiction over the matter despite the fact the alleged incident occurred off-campus.

169.     In the Appeal Determination, Dr. Parsley claimed that at the hearing Roe presented "ample" and "substantial" evidence that Doe's behavior "negatively affected her ability to focus and concentrate on her education and that her grades were negatively impacted."

170.     However, at the hearing, Roe only alleged that her grades suffered when she had to rearrange her schedule to accommodate counseling sessions.

171.     Accordingly, it was not established that the alleged sexual assault effectively denied Roe equal access to her education.

172.     Dr. Parsley in the appeal determination failed to acknowledge that Defendant Barbato improperly intervened and blocked Doe's withdrawal from RFU prior to the hearing.

173.     Dr. Parsley also incorrectly claimed that "[b]oth parties were able to cross-examine witnesses…"

174.     While Roe's advisor was permitted to cross-examine witnesses, Doe's advisor was not afforded a full and fair opportunity to cross-examine witnesses and Doe was not able to participate or assist his advisor during cross-examination.

175.     The appeal determination did not meaningfully address Doe's allegations of bias other than to say that Dr. Parsley did not find that the Decision Makers had biases against him that affected the outcome of the matter.

176.     The appeal decision was the final step in the University's disciplinary process.

## XIII.    **Damages to Doe.**

183.     Due to Defendants' unfair, unlawful and gender-biased conduct, Doe was subjected to a flawed, improper and inequitable investigation and adjudication process which failed to comport with Defendants' promises to Doe, as an enrolled student, and deprived him of rights afforded to him through Title IX and the Act.

31

184. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe was treated as a perpetrator and presumed guilty from the start.

185. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe was improperly expelled from RFU, preventing him from pursuing his choice of career as a physician's assistant.

186. Doe also lost his prestigious NHSC scholarship, which paid for the full cost of his tuition to medical school, provided him with a $1,200 per month living stipend and guaranteed him a job in a health resource shortage area.

187. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe has been improperly labeled a sexual predator.

188. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual misconduct and expulsion.

189. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe will have to disclose to any future educational institution or professional program, licensing authority, or job that he applies to, that he was found responsible for committing sexual misconduct, which carries a particularly harmful and overwhelmingly damaging stigma in today's social and political climate.

190. Due to Defendants' unfair, unlawful and gender-biased conduct, Doe's education and career path have been significantly disrupted, resulting in considerable economic and consequential harm.

191. Doe has not been able to secure steady employment in any capacity since the Sanction.

192.     Due to Defendants' unfair, unlawful and gender-biased conduct, Doe has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

193.     As a further result of RFU's actions, Doe has suffered a loss of future earnings.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq.
### (Against Defendant RFU)

194.     Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

195.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

196.     Title IX applies to all public and private educational institutions that receive federal funding, including RFU.

197.     Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). "Neither the Supreme Court nor [the Eleventh Circuit] has established a framework for analyzing Title IX challenges to university disciplinary proceedings." *Doe v. Samford Univ.,* No. 2:21-CV-00871-ACA, 2021 WL 3617702, at *6 (N.D. Ala. Aug. 15, 2021), quoting *Doe v. Valencia Coll.,* 903 F.3d 1220, 1236 (11th Cir. 2018).

198. Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the Doe was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

199. "A complaint may also allege particular procedural flaws affecting the proof." *Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018) (articulable doubt cast by arguing that administrative hearing panel did not sufficiently analyze evidentiary inconsistencies); *Norris v. Univ. of Colorado, Boulder,* 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Doe v. Marymount Univ.*, 297 F.Supp.3d at 585–86 (articulable doubt cast by noting a combination of: (1) procedural deficiencies; (2) an adjudicator's decision lacking compelling evidence; and (3) inconsistency in accuser's statements)."

200. While some circuits continue to analyze Title IX claims under the prior noted theories such as erroneous outcome and selective enforcement, the Seventh Circuit adopted the view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ*., 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?'" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ*., 928 F.3d at 667–68). *See Doe v. Loyola Univ.- Chicago,* No. 20 CV 7293, 2021 WL 2550063, at *6 (N.D. Ill. June 22, 2021), *appeal dismissed sub nom. Doe v. Loyola Univ. of Chicago,* No. 21-2360, 2021 WL 6689520 (7th Cir. Aug. 9, 2021).

201.    The Seventh Circuit's approach in *Purdue* has been adopted by other circuits. *See Doe v. University of Sciences*, 961 F.3d 203, 209, 377 Ed. Law Rep. 552 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex…this standard hews most closely to the text of Title IX."); *Doe v. University of Arkansas - Fayetteville*, 974 F.3d 858, 864, 381 Ed. Law Rep. 637 (8th Cir. 2020) ("To state a claim, therefore, [plaintiff] must allege adequately that the University disciplined him on the basis of sex—that is, because he is male."); *Schwake v. Arizona Board of Regents,* 967 F.3d 940, 947, 379 Ed. Law Rep. 546 (9th Cir. 2020), for additional opinion, *see*, 821 Fed. Appx. 768, 381 Ed. Law Rep. 285 (9th Cir. 2020) ("We adopt [the Seventh Circuit's] far simpler standard for Title IX claims. . . . ").

202.    Regardless of the standard employed, the facts of this case clearly establish that Defendants discriminated against Doe on the basis of his sex.

203.    Defendants' finding that Doe was responsible was utterly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715.

204.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

    i.    RFU failed to afford Doe the requisite presumption of innocence, thereby forcing him to prove his innocence.

    ii.    RFU lacked jurisdiction over the matter as the alleged incident occurred off-campus.

    iii.    Defendant Barbato improperly interfered with Doe's withdrawal from RFU in order to continue the Title IX process.

iv. The hearing panel displayed blatant bias toward Doe during the hearing.

v. The hearing panel inappropriately curtailed Doe's advisor's cross-examinations.

vi. The hearing panel improperly made statements in support of Roe and her testimony during the hearing.

vii. The hearing panel committed procedural irregularities by interrupting Doe's advisor's cross-examination of Roe to hear Roe's witnesses' testimony.

viii. The hearing panel committed procedural irregularities by not permitting Doe to observe the testimony of Roe's witnesses.

ix. The investigator and the hearing panel ignored flaws and inconsistencies in Roe's statements/testimony, including but not limited to: (i) Roe never raised her voice before or during the alleged sexual encounter with Doe; (ii) Roe, who is a trained member of the US Army, did nothing to stop Doe's alleged sexual assault despite having the opportunity to do so; (iii) Roe stated that after the initial sexual activity, Doe left her bedroom to go to the bathroom and she did not make any attempt to lock her bedroom door while he was in the bathroom, which she could have done if she was uncomfortable; (iv) Roe did not inform either of her roommates, who were both in close range, that she needed help while Doe was using the bathroom; (v) Roe stated that she engaged in the "69 position" with Doe, and positioned herself on top; (vi) Roe's admission that the 69 position required mutual participation and Doe did not force her into that position; (vii) Roe's admission that Doe rolled over so that she could get on top of him to perform oral sex on him; (viii) Roe's admission that Doe went downstairs when she told him that he had to go sleep downstairs; (ix) Roe's text to Doe the next morning to ask if he got home

safely; and (x) Roe's admission that she did not suffer any injuries as a result of the alleged assaults.

    x.    The Appeal Decision Maker summarily dismissed Doe's Appeal without considering the merits thereof.

205.    The pressure on the University to vindicate female students alleging violations of the Policy resulted in the University subjecting Doe to a biased and unfair process, which was tilted in favor of the female complaint and against him as a male respondent.

206.    It is well settled that a university that is driven to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution which "adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

207.    The University utilized the Policy to treat Doe, an accused male, differently from Roe, by aggressively disciplining him while wholly ignoring Roe's misconduct.

208.    Based on the foregoing, Doe was subjected to a biased and unfair process, in violation of Title IX, that was designed to find him responsible for sexual misconduct and to improperly and severely punish him for it.

209.    This unlawful discrimination in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including but not limited to: mental anguish, severe

emotional distress, injury to reputation, past and future economic loss, deprivations of fair process, loss of educational opportunities, and loss of future employment prospects.

210. As a direct and proximate result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing RFU to: (i) reverse the findings, decision and sanction; (ii) expunge Doe's disciplinary record with respect to the Roe complaint; (iii) remove any record of notations reflecting finding or the sanction of expulsion from Doe's educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Doe to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract
### (Against All Defendants)

211. Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

212. Doe applied to and enrolled at RFU and paid associated fees and expenses. He did so in reliance on the understanding, and with the reasonable expectations, that the University would implement and enforce the provisions and policies set forth in its official publications, including the Handbook and the Policy in a fair and impartial manner.

213. An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and RFU.

214. A relationship between a student and a university is contractual in nature. *See Doe v. Purdue*, 928 F.3d at 661.

215. The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

216.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Doe, and the covenant of good faith and fair dealing contained therein.

### A. *Breach of the Jurisdictional Requirements*

217.    RFU's Title IX Policy as set forth in its Student Handbook provides: that the University shall implement the Title IX Regulatory Policy to a "formal complaint" defined as "1. a document filed by a complainant with the Title IX Coordinator or signed by the Title IX Coordinator; 2. alleging sexual harassment (as defined in this section); 3. that occurred in an education program or activity of the University against the complainant while physically present in the United States; that was perpetrated by a respondent; and expressly requesting that the University investigate the allegation of sexual harassment." (Emphasis added).

218.    The definition of: "that occurred in an education program or activity of the University against the complainant while physically present in the United States;" is: "The University's education programs or activities are locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by the University."

219.    The allegations made by Roe described conduct that occurred in an off-campus apartment, in a building that was neither owned nor controlled by RFU.

220.    RFU never claimed to have owned or controlled Roe's apartment building.

221.    Yet, RFU proceeded to investigate the alleged misconduct against Doe despite the clear lack of a jurisdictional basis.

222. RFU implemented its Title IX policy and process in this matter without regard to the jurisdictional requirements implemented by the federal government in its amendments to Title IX in August of 2020.

223. Thus, RFU breached this provision of its contract with Plaintiff.

**B. _Breach of the Requirement to Conduct an Impartial Investigation_**

224. RFU further breached its contract with Doe when it failed to conduct a fair and impartial investigation.

225. Doe's level of participation in the investigation process was irrelevant to the Investigator's duty to conduct a fair, impartial and complete investigation and to produce a report based upon those duties.

226. Additionally, the burden of gathering evidence and the burden of proof must remain on universities, not on the parties. *See* Title IX Final Rule Summary Sec. 8.

227. The biased nature of the investigation was patently evident from the face of the final report. For instance, the report stated under the report's Detail and Consistency heading: "[Roe] filed a Title IX complaint ***because she was sexually assaulted*** by [Doe]."

228. The heading unfairly presumed the truth of Roe's allegations and violated Doe's right to "a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process."

229. Additionally, RFU failed to abide by its contract ensuring an objective evaluation of all inculpatory and exculpatory evidence.

230. Had the Investigator objectively evaluated the exculpatory evidence, she would have included all evidence, including the evidence that disputed Roe's statements.

231.    Instead, the Investigator did not document a detailed description of Roe's allegations, did not ask Roe probing questions to discern the credibility or logic of her account, did not ask Roe why she chose to stay with Doe at the bar when her group of friends told her they were leaving about an hour earlier with her car, did not ask Roe why she decided to take Doe to her home in an Uber or why she did not take Doe to his own home, and did not ask or investigate whether Roe suffered any injuries that may have corroborated her allegations of force.

232.    The Investigator drafted a report without asking any probing or objective questions about gaps or inconsistencies in Roe's narrative, or her conduct that conflicted with her claim of sexual assault and defies commons sense.

### C. *Failure to conduct an equitable hearing.*

233.    Defendants committed several breaches of their agreements with Doe during the hearing process, when RFU failed to provide an equitable and impartial hearing.

234.    A non-exhaustive list of Defendants' breaches during the hearing includes the following:

i.    The hearing panel prevented Doe from interviewing investigator Kind-Keppel at the hearing or critiquing the report;

ii.    Doe was deprived of his right to be heard by a panel of impartial decision-makers, when the hearing panel members accepted Roe's allegations at face value;

iii.    Doe was denied the opportunity to hear Roe's witnesses testify at the hearing and as a result, was prevented from presenting a full defense;

iv.    Doe was also unable to refute or even comment on any of the witnesses' testimony during his examination or his closing statement;

v.    The hearing panel ignored clear evidence tending to dispute Roe's credibility, including her admissions that she did nothing to verbally or physically prevent the alleged unwanted sexual conduct and in fact participated in the sexual activity; and

41

vi.    RFU imposed a severely unwarranted sanction upon Doe.

235.   Each of the foregoing contributed to a biased and procedurally defective hearing process which resulted in an erroneous outcome and an unwarranted sanction.

**D.   _RFU Failed to Presume Doe Innocent and Assign the Burden of Proof to the University_**

236.   RFU's Policy specifies that the "For each allegation in which the respondent was determined to be responsible or not responsible, the decision-maker(s) shall articulate findings of fact that support that determination. These findings must be based on a preponderance of the evidence, meaning that, based on the greater weight of the evidence, an asserted fact is more probable to be true than not." RFU Title IX Policy 16(c).

237.   The decision-makers misapplied the preponderance of the evidence standard when they found Roe's account of the events to be more credible than Doe's despite issues with her statements, and the various inconsistencies that should have called her account into question.

238.   The Investigator and the hearing panel ignored flaws and inconsistencies in Roe's statements/testimony, including but not limited to the following: (i) Roe never raised her voice before or during the alleged sexual encounter with Doe; (ii) Roe, who is a trained member of the US Army, did nothing to physically impede Doe's alleged sexual assault despite having the opportunity to do so; (iii) the inaction by Roe to keep Doe out of her bedroom when he left her room to go to the bathroom, including the lack of any attempt to lock her bedroom door, which she easily could have done; (iv) Roe did not inform either of her roommates, who were close by, that she needed help while Doe was using the bathroom; (v) Roe admitting that she engaged and participated in the "69 position" with Doe, and that she got on top; (vi) Roe's admission that the 69 position requires mutual participation and Doe did not force her into that position; (vii) Roe's admission that she got on top of Doe to perform oral sex on him; (viii) Roe's admission that Doe

42

went downstairs to sleep when she told him to; (ix) Roe's text message to Doe the next morning, wherein she asked if he got home safely; and (xi) Roe's admission that she did not suffer any injuries as a result of the alleged assaults.

239.    The foregoing reveals a process in which Doe was presumed guilty from the time the complaint was received, and the investigation was conducted in a manner to reach this predetermined result.

240.    In attempting to demonstrate their vigorous compliance with the April 2011 Dear Colleague Letter, Defendants subjected Doe to an insufficient process by failing to provide him a reasonable opportunity to defend himself, instead arriving at an arbitrary, predetermined, and unwarranted decision motivated by gender bias and in breach of their contractual obligations.

241.    As a direct and proximate result of the foregoing, Doe sustained damages including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries, and other direct and consequential damages.

242.    As a direct and proximate result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing RFU to: (i) a reversal of the findings, outcome and sanction; (ii) expungement of Doe's disciplinary record with respect to the Roe complaint; (iii) remove any record or notations of the finding or sanction of expulsion from Doe's educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Doe to the status quo ante.

**AS AND FOR A THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

243.    Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

244.    In conducting its investigation and adjudication of Roe's complaint against Doe, RFU owed Doe a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying RFU's fairly and impartially, appreciating the severity of the charges and potential consequences, and in consideration of Doe's fundamental rights to a fair process.

245.    Through the acts set forth above, RFU breached its duty by carelessly, improperly, and negligently performing its investigation and adjudication of the charges against Doe, and improperly facilitated a process that violated the rights and interests of Doe.

246.    As a direct result of Defendants' negligence, Doe was erroneously found responsible for sexual misconduct and will suffer resultant damages therefrom for the foreseeable future.

247.    Accordingly, RFU is liable to Doe for negligence and for all damages arising therefrom.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Violation of 110 ILCS 205/9.21**
**(Against Defendant RFU)**

248.    Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

249.    The Illinois General Assembly, in Act 205 of the Board of Higher Education Act commonly known as Preventing Sexual Violence in Higher Education Act provides minimum

standards by which a private university, including RFU, must follow when addressing complaints of sexual assault and disciplinary proceedings related thereto.

250.    In the instant case, RFU and its agents and employees violated several of the protections afforded by the Act, resulting in significant damages to Doe, including loss of education, and loss of future educational and career opportunities.

251.    The Act contains no express language granting a private right of action.   The absence of such language is not dispositive.   Illinois courts may consider the totality of the circumstances in determining whether a private right of action can be implied in a statute.   *See, Moore v. Lumpkin*, 630 N.E.2d 982, 989 (1st Dist. 1994).

252.    The Illinois Supreme Court applies four prerequisites for determining whether a private right of action is implied by the statute.   *Id.*   "The prerequisites are: (1) the plaintiff is a member of the class of persons for whose benefit the statute was enacted; (2) plaintiff's injury is one which the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) a private right of action is necessary to effectuate the purpose of the act, i.e., to provide an adequate remedy for violations of the statute."   *Id.*

253.    Here, Doe meets all four prerequisites and is entitled to relief under the statute.

254.    Section 25 of the Act (110 ILCS 155/25) clearly and unequivocally establishes the minimal procedures that must be followed for the protection of a respondent accused of sexual misconduct in a higher education institution. Doe, as a respondent, was therefore a member of a protected class under the statute.

255.    The procedures required by the Act were violated by RFU: (i) when RFU shut Doe out of the hearing while Roe's witnesses testified, thereby preventing him from participating in the hearing and suggesting questions to his advisor; (ii) by failing to meaningfully afford Doe the

presumption of innocence; (iii) by failing to implement basic fairness in the investigation and during the hearing; and (iv) by demonstrating biases against Doe throughout the investigation and hearing, and holding him to a different standard that that imposed by the statute.

256.    Doe was significantly harmed by RFU's failure to follow the required procedures set forth in the statute, including the right to participate and the right for a fair and unbiased. The harms suffered by Doe, including the unfair finding that was based solely on conflicting statements of the complainant, resulted in injuries that the Act was designed to protect.

257.    The underlying purpose of the statute is to offer equal protection to complainants and respondents engaged in a sexual misconduct hearing. The violation of this basic right and the private right of action resulting therefrom is consistent with the purpose of the Act.

258.    The Act, which provides specific standards that a higher institution must implement and follow, seeks to redress wrongs of sexual misconduct proceedings prior to the enactment of the Act, and to provide minimal protection for complainants and respondents in sexual misconduct hearing. Therefore, the language of the Act supports a private right of action.

259.    Doe is therefore entitled to injunctive relief and damages for those protections required by the Act which RFU failed to follow.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff John Doe respectfully requests that this Court issue an order as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Doe:

a.  Damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, past

and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

b. Expungement of all records related to the investigation, adjudication, disciplinary findings, and appeals process, notations, and sanctions from his records via injunctive relief;

c. Immediate reinstatement as a student in good standing via an injunction;

d. Reimbursement for the loss of the NHSC scholarship including the payment of tuition, $1,200 per month living stipend and the loss of a job upon graduation; and

e. Any and all further actions required to return Doe to the status quo ante.

(ii) On the second cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career and opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) On the third cause of action for negligence, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational, career and opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) On the fourth cause of action for violation of 110 ILCS 205/9.21, a judgment awarding Doe injunctive relief and damages for those protections required by the Act which RFU failed to follow; and

(v)    Awarding Doe any such other and further relief as this Court deems just, equitable, and proper, including attorneys' fees.

## JURY TRIAL DEMANDED

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:  New York, New York
        March 31, 2023

Respectfully submitted,

*Attorneys for Plaintiff John Doe*

**NESENOFF & MILTENBERG, LLP**

By: */s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq. (*pro hac vice forthcoming*)
Tara J. Davis, Esq. (*pro hac vice forthcoming*)
Helen Setton, Esq. (*pro hac vice forthcoming*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
hsetton@nmllplaw.com

**ELVIS GONZALEZ, LTD.**

By: */s/  Elvis Gonzalez*
Elvis Gonzalez, Esq. (Bar No. 6280115)
233 South Wacker Drive, Suite 6149
Chicago, Illinois 60606
(312) 558-9779
egonzalez@elvisgonzalezltd.com